# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

TONI TOSTON,

                Plaintiff,

    v.                                    Case No. 16-cv-1112-pp

PAMELA ZANK, JOHN O'DONOVAN,
and WILLIAM POLLARD,

                Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTION PURSUANT TO RULE 54(b) (DKT. NO. 29), DENYING PLAINTIFF'S MOTION TO COMPEL DISCOVERY (DKT. NO. 32), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 35), DENYING PLAINTIFF'S MOTION TO STRIKE EXHIBIT 1002-18 THROUGH 24 (DKT. NO. 43), GRANTING DEFENDANTS' MOTION FOR LEAVE TO FILE DECLARATIONS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 49) AND DISMISSING CASE**

---

On August 18, 2016, the plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983 alleging that the defendants violated his constitutional rights. Dkt. No. 11. Specifically, the plaintiff asserted that the defendants issued him a conduct report resulting in segregation time in retaliation for his filing an inmate complaint. Id. The court allowed the plaintiff to proceed on a First Amendment retaliation claim against defendants Pamela Zank, John O'Donovan and William Pollard; the court dismissed James Muenchow as a defendant. Dkt. No. 17. Before the court are the plaintiff's motion pursuant to rule 54(b), dkt. no. 29; the plaintiff's motion to compel discovery, dkt. no. 32; the defendants' motion for summary judgment, dkt. no.

35; the plaintiff's motion to strike Exhibit 1002-18 through 24, dkt. no. 43; and the defendants' motion for leave to file declarations in support of defendants' motion for summary judgment, dkt no. 49.

## I.     Plaintiff's Motion Pursuant to Rule 54(b) (Dkt. No. 29)

The court denied the plaintiff's Rule 60(b) motion for reconsideration of its decision to dismiss Muenchow as a defendant, see dkt. no. 28, but twelve days later, the plaintiff filed a motion under Rule 54(b), again asking the court to reconsider its dismissal of Muenchow, dkt. no. 29. The plaintiff bases his Rule 54(b) argument on the language the court used in its order denying his Rule 60(b) motion. In that order, the court noted that the plaintiff had not alleged in his complaint that "Muenchow lied about the plaintiff making a false statement," and therefore had not alleged a claim against Muenchow. Dkt. No. 28 at 3. In this Rule 54(b) motion, the plaintiff insists that he *did* assert in his amended complaint that Muenchow had "blatantly" lied in Muenchow's decision regarding plaintiff's inmate complaint. Dkt. No. 29.

Given the plaintiff's motion, the court reviewed the docket. While the plaintiff did not allege in his *original* complaint that Muenchow had lied, the court neglected to look at the *amended* complaint when it ruled on the Rule 60(b) motion. The court now sees that on page two of the September 15, 2016 amended complaint, in paragraph 10, the plaintiff stated that he appealed Muenchow's rejection of complaint WCI-2012-17267, "stating that defendant Muenchow was blatantly lying in his decision and there was no evidence on

2

record to support his decision." Dkt. No. 11 at 2. The court acknowledges that it erred in saying that the plaintiff had not alleged that Muenchow was lying.

But that was not the main reason the court dismissed Muenchow as a defendant. The court dismissed Muenchow because the plaintiff did not "allege[] that Muenchow caused him a deprivation that would deter him from exercising his constitutional rights in the future." Dkt. No. 17 at 6. Although Muenchow dismissed the plaintiff's inmate complaint, and perhaps did not believe the plaintiff's claim, Muenchow still forwarded the plaintiff's allegations for a PREA investigation "in compliance with Executive Directive 16A." Dkt. No. 40-1 at Ex. 1009-002.  The court noted that "[t]his referral did not deprive the plaintiff of any right—it sought to make sure that someone reviewed the allegations to make sure that the plaintiff had not been the subject of sexual misconduct." Dkt. No. 17 at 6. Despite the court's error in stating that the plaintiff had not alleged that Muenchow lied, the court has no reason to change its conclusion that the plaintiff has not sufficiently alleged a First Amendment retaliation claim against Muenchow. The court will therefore deny the plaintiff's Rule 54(b) motion.

## II.  Plaintiff's Motion to Compel Discovery (Dkt. No. 32)

The plaintiff has asked the court to compel the defendants to provide recordings of the "entire video" of his pat search, which was at issue in his inmate complaint. He also asks the court to compel the defendants to provide a

copy of the notes or recordings of defendant Zank's interview with the plaintiff regarding the pat search.

The defendants filed a response in opposition to the plaintiff's motion. Dkt. No. 33. Regarding the video, they assert that they have allowed the plaintiff to review the available video for the case, and that it shows "the May 3, 2012 pat search and was preserved as part of a Division of Adult Institutions investigation file that was obtained by Defendants' counsel from the Department of Corrections Central Office and produced to plaintiff." Id. at 1. They indicate that "no other video of the 2012 search exists." Id. While the plaintiff's motion alleges that the defendants "edit[ed] the video to not show the entire pat search in its entirety," dkt. no. 32 at 1, the defendants respond that the plaintiff has provided no evidence to support this serious allegation, dkt. no. 33 at 1-2. The court agrees. The plaintiff has not provided the court with any evidence or any reason to believe that the defendants did not show him a complete and unedited version of the recording of the pat search. Further, the court has reviewed the video (submitted as Video Exhibit 1003), and finds nothing to suggest that it was edited.

Regarding defendant Zank's interview with the plaintiff, the defendants state that they provided the plaintiff with the transcript of his interview with defendant Zank and told him that it was the only information they had from the interview. Dkt. No. 33 at 2. They explain that defendant Zank has retired, and does not have any notes or recordings from that interview. Id. The court

recognizes that the plaintiff has used the defendants' inability to provide additional documents or recordings surrounding his interview with defendant Zank as the foundation for his motion to strike the interview transcript portion of the defendants' exhibit. The court will address the plaintiff's motion to strike later in this order. Nevertheless, the defendants have provided the plaintiff with a copy of the transcript from his interview. While a transcript is not as good as a recording, it is significantly better than notes. The court cannot compel defendants to produce what they do not possess, <u>See</u> Fed. R. Civ. P. 34 (requiring production of a relevant discoverable document that is in the "possession, custody or control" of a party), and the plaintiff has provided no reason why the court should require the defendants to produce more than they have. The court will deny plaintiff's motion to compel further documentation from the interview.

## III. Defendants' Motion for Summary Judgment (Dkt. No. 35)

### A. Relevant Facts[1]

At the time of the events in the complaint, the plaintiff was an inmate at Waupun Correctional Institution. Dkt. No. 37 at ¶1. The defendants were employed at Waupun: defendant Zank was a Corrections Program Supervisor, but more relevant to this case, she was an investigator under the federal Prison

---

[1] The court takes the relevant facts from the Defendants' Proposed Findings of Fact, dkt. no. 37, Plaintiff's Amended Response to Defendants' Proposed Findings of Fact, dkt. no. 55, and Plaintiff's Proposed Findings of Fact, dkt. no. 47. The court has also considered and included facts set forth in the declarations of Pamela Zank, dkt. no. 38, Brian Foster, dkt. no. 39, and Yana Pusich, dkt. no. 40.

Rape Elimination Act of 2003 ("PREA"). Dkt. No. 38 at ¶¶2, 4. A PREA investigator must investigate, record and report claims of sexual assault. <u>Id.</u> at ¶4. Defendant O'Donovan was a captain and defendant Pollard was the warden. Dkt. No. 37 at ¶¶ 2-4.

On May 6, 2012, the plaintiff sent a letter to Zank, alleging that three days earlier he had been sexually assaulted by a correctional officer (who is not a defendant). <u>Id.</u> at ¶¶ 5-6. He stated in the letter that "[o]n May 3rd while [the accused officer] was doing a routine pat search he hit my testicles with what I can only describe as a karate chop in a[n] upward motion." <u>Id.</u> at ¶7. The plaintiff went on to say that he "told [the accused officer] that he hit my testicles and not to do it again—but when he continued to the next leg he did it again." <u>Id.</u> at ¶8.

Zank received the plaintiff's letter on May 10, 2012, and viewed the video of the accused officer's May 3, 2012 pat search of the plaintiff. <u>Id.</u> at ¶9. The next day she interviewed the plaintiff, who further explained the incident (among other things). <u>Id.</u> at ¶9; Dkt. No. 38-3 at 26. The plaintiff told Zank that around 4:00 p.m. or 4:30 p.m. in the afternoon on May 3, he was subjected to a pat search by the accused officer, who "like chopped [the plaintiff's] balls" during the search. Dkt. No. 37 at ¶10. The plaintiff said,

> And then I told him, I said, you just got down (*sic*)
> hitting my testicles, dude. Don't do that no more . . . .
> And then when he did the other leg, he did it again.
> Then I was like, man, I just told you to stop doing that,
> man. And then he thought it was funny. He was like,

huh, huh, huh, you know? Like giggling about it. And then I just went to rec.

Id. at ¶11.

Zank talked with the plaintiff about whether the incident might have been an accident; the plaintiff responded that the accused officer had done it twice, and thought it was funny. Id. at ¶12. Zank asked the plaintiff what he would like to happen; the plaintiff said he never wanted to see or be around the correctional officer again. Id. at ¶13; Dkt. No. 38, Ex. 1002 at 6-7. The plaintiff told Zank that he had submitted an inmate complaint about the pat search incident through the inmate complaint review system (ICRS) to prevent his interaction with the accused officer, but that the accused officer had still been able to interact with the plaintiff. Dkt. No. 38, Ex. 1002 at 7. The plaintiff also told Zank that he had been "trying to get kicked out of [Waupun];" he did not like it there, he wanted a "fresh start" and he had "like 20 years" left to serve. Dkt. No. 37 at ¶¶14-15; Dkt. No. 38, Ex. 1002 at 8. When Zank asked if the plaintiff wanted to go to the Wisconsin Secure Program Facility (WPSF), the plaintiff became upset, because he had apparently already had similar numerous discussions with Zank in the past. Dkt. No. 37 at ¶¶15-16. The plaintiff ultimately responded that he would go anywhere to leave Waupun. Id. at ¶17. The interview ended with the plaintiff discussing his disposition received from an earlier conduct report, "seg trades" with other prisons, and how he wanted to be placed on the list for such a trade. Id. at ¶¶18-19; Dkt. No. 38, Ex 1002 at 12.

On May 14, 2012, Zank received another letter from the plaintiff, in which he repeated his request for a transfer out of Waupun. Id. at ¶20.

The defendants indicate that on May 18, 2012, Zank received a copy of the plaintiff's inmate complaint regarding his allegations against the accused officer. Id. at ¶21. The plaintiff had dated the complaint on the same day he sent Zank the initial correspondence—May 6, 2012. In the complaint, the plaintiff had described the alleged sexual assault substantially the same way he had described it to Zank: the accused officer making a "karate chop"-type motion to the plaintiff's testicles two different times. Id. at ¶22.

The complaint had been dismissed with modifications; the dismissal was affirmed on appeal. Dkt. No. 40-1 at 7-8. The modification involved compliance with Executive Directive 16A, which called for the inmate complaint examiner to forward any complaint that contained allegations of sexual misconduct to the warden, who in turn forwarded it to Zank, a PREA investigator, for investigation. Dkt. No. 37 at ¶¶2, 23; Dkt. No. 40-1 at 2; Dkt. No. 38-1 at 3.

On May 22, Zank received another letter from the plaintiff asking to be moved. Dkt. No. 37 at ¶24. The plaintiff asked why he was "being forced to stay in the presence of the officer who sexually assaulted [him]?" and noted that "306.17(5)(A) states, 'staff shall strive to preserve the dignity of inmates in all searches conducted under this section.'" Id. at ¶25. The plaintiff stated that the accused officer had "touched my testicles twice, that is inappropriate and not in conformity with standard 'pat searches,'" asked to be protected "from this

officer and all future retaliation for reporting this assault," and noted that "the red book clearly grants [him] the right to be moved from this facility." Id. at ¶25. He then asked why he was still at Waupun, and insinuated that Zank was attempting to cover up the accused officer's purported misconduct. Id. at ¶25.

On May 30, 2012, Zank interviewed the accused officer and told him about the plaintiff's allegations. Id. at ¶¶26-27. The officer responded that the incident never occurred; he stated that the plaintiff and another inmate had begun a campaign in mid-May to get other inmates to write complaints about the accused officer's pat searches of them because the plaintiff and another inmate did not like him pat searching them. Id. at ¶27. The accused officer described how he did a pat search, which he said was how he was trained. Id. at ¶28.

On June 7, 2012, Zank interviewed the other correctional officer who was present when the accused officer conducted the pat search of the plaintiff (Lunde, not a defendant), and showed that officer the video of the search (which was inconclusive as to the plaintiff's allegations). Id. at ¶¶29-30. Zank asked Lunde if he "recall[ed] hearing the plaintiff make any type of comments about the pat search." Id. at ¶¶31-32. Lunde responded "no, nothing." Id. at ¶32. Zank also asked if Lunde had any knowledge regarding the plaintiff's claims, and the other officer responded that the plaintiff and another inmate "had been trying to get everyone to complain about [the accused officer]. They just don't like being searched. They have been encouraging other inmates to

complain. I would have heard [the plaintiff] complain if he would have, I was right there." Id. at ¶33.

Zank concluded her investigation on June 15, 2012, and reported that

> [the plaintiff] was issued a conduct report for lying about staff. There is no evidence to support his allegation. His allegation appears to be driven by his desire to move from this facility to another. The video footage shows the inmate being pat search [sic], obviously, there is no audio, but [the other officer], who was right there, did not hear any comment from [the plaintiff] or see anything inappropriate by [the accused officer].

Id. at ¶34.

The security director of the prison reviewed and approved Zank's investigation report. Id. at ¶35. Defendant Pollard reviewed and signed the report on June 22. Id. at ¶36.

The conduct report Zank had issued to the plaintiff for lying about staff as part of the conclusion of her investigation stated that on May 6, 2012, the plaintiff reported that a correctional officer had "karate chop" his testicles during a routine pat search, and that the plaintiff had alleged that the accused officer sexually assaulted him. Id. at ¶¶37-39. The report noted that the accused officer had been interviewed and had stated that he had done the pat search as he was trained. Id. at ¶39. It further noted that the other officer present during the pat search was interviewed, and had said that he did not hear the plaintiff make any comments to the accused officer nor did he see the accused officer do anything inappropriate. Id. The report also stated that both

the interviewed officers had said that the plaintiff had been encouraging other inmates to write the accused officer up for pat search issues. <u>Id.</u> at ¶40. Zank noted in the report that "it would appear that [the plaintiff] is lying about being 'karate chopped' in the testicles as he is requesting a transfer out of [Waupun] as he does not want to serve out the rest of his sentence at this facility." <u>Id.</u>

Prison staff held a hearing on the conduct report on June 29, 2012. <u>Id.</u> at ¶43. The plaintiff submitted his May 6 inmate complaint as evidence, and gave a statement denying ever making the allegation regarding the accused officer "outside of [his] complaint." <u>Id.</u> at ¶44. He also denied saying that the accused officer "karate chopped" him. <u>Id.</u> at ¶46.

The hearing officer, defendant O'Donovan, reviewed the evidence and found the plaintiff guilty of lying about staff. <u>Id.</u> at ¶47. In his written decision, O'Donovan concluded that the plaintiff's inmate complaint, in which he described the accused officer's act as a "karate chop," contradicted the plaintiff's statement at the hearing, in which he denied saying the accused officer "karate chopped" him. <u>Id.</u> at ¶48. O'Donovan also observed that the materials submitted by the plaintiff showed that he had contacted another prison official about the incident, and surmised that "there was no assumption or expectation that [the other prison official] would have to keep [the alleged incident] confidential." <u>Id.</u> at ¶49; Dkt. No. 38, Ex. 1004 at 9. O'Donovan went on to note that although Zank did not state how she found out about the incident, he knew that she was a PREA investigator. Dkt. No. 37 at ¶50.

11

O'Donovan recapped Zank's investigation of the incident, concluded that the plaintiff was guilty of lying about staff, and imposed a disposition of 180 days in disciplinary separation. Id. at ¶¶51-52.

The plaintiff appealed the disposition to Pollard, who affirmed the decision. Id. at ¶55.

In 2016, several years after he had finished serving his time in disciplinary separation for the conduct report, the plaintiff asked Waupun's current warden to review the conduct report. Id. at ¶58. He argued that because the basis of the lying-about-staff offense was an inmate complaint, and because the rule states that an inmate is guilty of the offense if he makes a false statement *outside the complaint review system*, the evidence did not support his violation. Id. at ¶¶59-60 (emphasis added). The current warden agreed with the plaintiff and dismissed the conduct report, stating that "upon his review . . . a conduct report was not warranted." Id. at ¶62; Dkt. No. 39, Ex. 1008.

B.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that

"might affect the outcome of the suit." <u>Anderson</u>, 477 U.S. at 248. A dispute

over a "material fact" is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be disputed or is genuinely disputed

must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a

motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C.    <u>Discussion</u>

As the court noted the plaintiff is proceeding on a First Amendment

retaliation claim.

The defendants urge the court to grant summary judgment in their favor

because there is no evidence that plaintiff's exercise of his constitutional rights

was a motivating factor in O'Donovan's imposition of the 180 days of

disciplinary separation. Dkt. No. 36 at 12. They further argue that even if the

plaintiff could make a *prima facie* showing of retaliation, he has not provided

13

any evidence that their stated reason for the discipline—their belief that the plaintiff made a false statement about a staff member outside the inmate complaint process—was a lie. Id. at 16.

To state a First Amendment retaliation claim, the plaintiff must show that "(1) he engaged in a protected activity; (2) he suffered a deprivation likely to deter First Amendment activity in the future; and (3) a causal connection between the two." Watkins v. Kasper, 599 F.3d 791, 794 (7th Cir. 2010); Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). The plaintiff does not have to show that retaliation was the only factor that motivated the defendants' actions, but he must show that it was a motivating factor. See Woodruff v. Mason, 542 F.3d 545, 551(7th Cir. 2008) (citing Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004)). If he can show that retaliatory animus was a factor, the burden shifts to the defendants to prove that the same actions would have occurred in the absence of the protected conduct. Spiegla, 371 F.3d at 943.

A plaintiff can show retaliatory animus through direct or circumstantial evidence. Kidwell v. Eisenhauer, 679 F.3d 957, 965 (7th Cir. 2012). Direct evidence does not require the trier of fact to rely on inference, or presumption. Id. (quoting Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 720 (7th Cir. 2005)). Circumstantial evidence requires an inference. Id. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at [others]." Id. (quoting Long v. Teachers Retirement Sys. of Ill., 585 F.3d 344, 350 (7th Cir. 2009)). "To

14

demonstrate the requisite causal connection in a retaliation claim, [a] plaintiff[]
must show 'that the protected activity and the adverse action are not wholly
unrelated.'" Id. (quoting Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918
(7th Cir. 2000)).

The plaintiff has alleged that he was exercising his First Amendment
right by complaining about purported sexual misconduct by a correctional
officer. The defendants do not dispute this for summary judgment purposes,
dkt. no. 36 at 12, and the court concludes that the plaintiff's act of
complaining about alleged sexual misconduct is protected by the First
Amendment. See Walker v. Thompson, 288 F.3d 1005, 1007, 1009 (7th Cir.
2002). The evidence is sufficient to support the first element of a retaliation
claim.

The court also assumes for summary judgment (and the defendants do
not argue otherwise, see dkt. no. 36 at 12-13) that issuing an inmate a conduct
report, finding him guilty and imposing a disciplinary sanction of 180 days in
segregation is a deprivation likely to deter the plaintiff from exercising his
rights in the future.

The parties dispute only whether there was a causal connection between
the plaintiff's exercise of his rights and the deprivation.

1. *Zank and the Conduct Report*

The plaintiff has presented no direct evidence that Zank wrote the report
to retaliate against him. He does not allege that Zank told him she was going to

punish him for making the allegation against the accused officer. He does not argue that she told anyone else she was going to do so. He does not allege that she wrote him up the minute he made the allegation. In fact, the undisputed evidence shows that Zank began her PREA investigation the day after she received the plaintiff's May 6, 2012 letter—on May 11, 2012. Dkt. No. 38 at 3. She did not issue the conduct report until a month later, after completing her investigation. Dkt. No. 38-5 at 5.

a.    Timing of Zank's report

Instead, the plaintiff argues that the timing of Zank's issuance of the conduct report, and the fact that a different warden dismissed the complaint years later, support his claim that Zank issued the report in retaliation against him.

The Seventh Circuit has held that suspicious, by itself, rarely will create a triable issue. Kidwell, 679 F.3d at 966. "The reason is obvious: '[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment.'" Id. (quoting Loudermilk v. Best Pallet Co., 636 F.3d 312, 315 (7th Cir. 2011)).

The plaintiff's "suspicious timing" argument resembles a logic error, in which one assumes that because an event occurred first, it must have caused a later event. The plaintiff reasons that because he first alleged that the accused officer sexually assaulted him, Zank's subsequent conduct report must have

been punishment—retaliation—for the fact that he made that allegation. That logic is not compelling.

The plaintiff is right that if he had not alleged that the accused officer sexually assaulted him, Zank would not have had a basis for concluding that he lied when he said that the accused officer sexually assaulted him. If the plaintiff had not made the allegation, there would have been no "statement" for Zank to label a lie. That does not show, however, that the *reason* Zank labeled the statement a lie is because she wanted to punish the plaintiff for making the allegation.

In addition, the alleged adverse action—the conduct report—did not take place "close on the heels" of the plaintiff's allegation. Kidwell, 679 F.3d at 966. Zank did not issue the conduct report until June 15, 2012—over a month after she received the plaintiff's May 6, 2012 letter. The plaintiff's timing argument is not persuasive.

b.    Subsequent dismissal of Zank's report

The plaintiff also argues that because a later warden dismissed the conduct report, Zank must have issued the report to punish him for making the allegation against the accused officer. The record does not support this argument.

On August 25, 2016, the plaintiff wrote a letter to then-warden Brian Foster; it was received August 29, 2016. Dkt. No. 39-1. In the letter, the plaintiff asked Foster to "look into" Zank's conduct report, "because the finding

of guilt was not supported by any evidence." Id. He went into detail about why he believed that the finding of guilt was unwarranted, and asked Foster to remove the report from his record in its entirety. Id.

Foster must have granted the plaintiff's request, because on September 23, 2016, the plaintiff wrote to him again. Dkt. No. 39-3. In this letter, the plaintiff asked Foster why he had "dismissed" the complaint from the plaintiff's record. He says that Foster failed to explain why he'd dismissed the report: "is it because there was no evidence that I lied; was it because there was no evidence that I made a false statement outside of the complaint procedure?" Id. He asked Foster to state his reasoning, "so there is no room for speculation as to why you made your decision." Id.

On September 28, 2016, Foster responded to the plaintiff. Dkt. No. 39-2. He said, "Upon my review of the incident and subsequent documentation, I found that under the circumstances, a conduct report was not warranted." Id.

This does not prove that Zank issued the conduct report to punish the plaintiff for exercising his First Amendment rights. Foster did not explain *why* he believed that the conduct report was not warranted. The record contains no evidence about why Foster dismissed the conduct report over four years after Zank issued it. The dismissal does not support the plaintiff's argument about Zank's motive for issuing the conduct report.[2]

---

[2] In Heck v. Humphrey, the Supreme Court held "that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or

c. Content of Zank's report

The defendants argue that because neither the timing nor the subsequent dismissal prove that Zank had a retaliatory motive, the court should grant summary judgment in Zank's favor. There is, however, one more piece of evidence in the record: the conduct report itself.

Zank wrote that she issued the report because she found that the plaintiff had violated Rule Number 303.271, lying about staff. Dkt. No. 38-5 at 5. Wis. Admin. Code § DOC 303.271 reads as follows:

> Any offender who makes a false written or oral statement about a staff member which may affect the integrity, safety or security of the institution or staff, and makes the false statement outside the complaint review system is guilty of an offense.

Dkt. No. 38-6 at 6. For an officer to conclude that an inmate violated §DOC 303.271, an officer must have evidence that (a) the plaintiff made a false statement, (b) orally or in writing, (c) about a staff member, (d) outside of the inmate complaint review system, (e) that affected the integrity, safety or security of the institution or staff.

The conduct report has a space for the issuing officer to write a description of what happened. Here is what Zank wrote:

---

sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." Edwards v. Balisok, 520 U.S. 641, 643 (1997). The Edwards Court held that that same doctrine applied when an inmate challenged the validity of prison disciplinary proceedings. Id. at 647. While this court believes that a judgment in the plaintiff's favor would imply the invalidity of the conduct report and the disciplinary proceedings, the court does not base its decision on the Heck doctrine.

> On 5-6-12 inmate Toston #327273 reported that [the accused officer] had "karate chop" him in his testicles. Toston alleges he was sexually assaulted during a routine pat search. [The accused officer] was interviewed in regards to this allegation and reports he did not pat search inmate Toston prior to inmate recreation and he did his pat search as he was trained. Officer Lunde was interviewed as well. Officer Lunde was in the same area at the same time pat searching another inmate for recreation. Officer Lunde reports he did not hear inmate Toston make any comments to [the accused officer] or see [the accused officer] do anything inappropriate, he reports seeing [the accused officer] do a pat search.
>
> Both [the accused officer] and Lunde report inmate Toston has been encouraging other inmates to write [the accused officer] up for pat searching issues. It would appear that inmate Toston is lying about being "karate chopped" in the testicles as he is requesting a transfer out of WCI as he does not want to serve out the rest of his sentence at this facility.

Dkt. No. 38-5 at 5-6.

The plaintiff argues that Zank has provided no evidence that the accused officer did not inappropriately touch him. Dkt. No. 45 at 8. He asserts that she did not say in the report that he made a false statement outside of the inmate complaint review process. Id. at 7-8. And he assumes that Zank's reference to May 6, 2012 is a reference to his May 6, 2012 letter to her, and argues that that letter was not a statement "outside" of the complaint review process. He says that part of that very process is a requirement that the inmate try to resolve the issue on his own before submitting a complaint, and that his May 6, 2012 letter to Zank was his effort to do just that. Id. at 8.

None of the plaintiff's arguments amount to evidence—even circumstantial evidence—that Zank issued the conduct report to punish him for exercising his First Amendment rights. At best, they show that (a) he thinks she was wrong in concluding that his letter to her wasn't part of the inmate complaint review process, and (b) he disagrees with her conclusion that he lied about what the accused officer did. Even viewing the facts in the light most favorable to the non-moving party—the plaintiff—there is no indication that Zank was motivated by an intent to punish the plaintiff for speaking.

As the court has mentioned, Zank did not issue the conduct report until over a month after she received the plaintiff's letter. By the time she issued the report, she had reviewed the video footage of the pat search, dkt. no. 38-3 at 4; she had interviewed the plaintiff, dkt. no. 38-3 at 4, 26; she had interviewed the accused officer and Officer Lunde, dkt. no. 38-3 at 3. The evidence indicates that Zank did not issue the report until after she had conducted a month-long investigation into the plaintiff's allegations, viewed the evidence and spoken to the witnesses. This evidence supports the conclusion that Zank issued the report because she concluded that the plaintiff had lied. The fact that she did not mention in the report itself one of the elements of a violation of §DOC 303.217, or even the fact that she may have been wrong about one of those elements, do not constitute genuine disputes of material fact about whether she issued the report to retaliate against the plaintiff.

As with Zank, the court must look at circumstantial evidence to try to determine O'Donovan's motive for finding the plaintiff guilty of lying about staff, and for sanctioning him.

We have O'Donovan's reasoning. On June 29, 2012, O'Donovan issued a document entitled "Disciplinary Hearing Reasons for Decision and Evidence Relied On." Dkt. No. 38-5 at 9. The document says that O'Donovan found the plaintiff guilty of violating §DOC 303.271. Id. Under the section titled "Offender Statement," the document says,

> I never made the allegation outside of my complaint. I was not trying to injure an officer in the complaint. I didn't know I was subject to a disposition being it was part of a complaint. I was only describing the position of his hand. I didn't say he Karate chopped me. I don't say anything about a transfer in the complaint.

Id. That is the plaintiff's statement of his defense. Under the "Evidence" section, O'Donovan states that he reviewed the plaintiff's inmate complaint (#2313004) and the above statement from the plaintiff. Id.

Under "Reason for Decision," O'Donovan listed several. First, he reasoned that Zank had "no vested interest in the outcome of this hearing." Id. Next, he said that in the plaintiff's complaint, the plaintiff said that the accused officer "karate chopped [the plaintiff's] testicles in an upward motion." O'Donovan found that this contradicted the plaintiff's offender statement, where he maintained that he did not say the accused officer karate chopped him. Id. Third, O'Donovan said that in the plaintiff's complaint, "he point[ed] out at

22

least twice that he contacted Lt. Braemer about the incident." Id. Fourth, he pointed out that Zank was a PREA investigator, required to forward any inmate complaint alleging sexual misconduct or assault to the warden, and requiring investigation. Id. Fifth, he noted that Zank had reviewed two officers (including the accused officer), both of whom contradicted the plaintiff's version of events. Id. O'Donovan concluded that it was "more likely than not that the inmate made a false statement about staff in stating that an officer had karate chopped his testicles," and concluded that such a false statement "would affect the safety and integrity of the officer and institution by accusing the officer of a sexual assault that did not happen." Id.

The defendants did not separate their summary judgment arguments by defendant. Most of their arguments relate to Zank. They note, however, that while the defendant made two statements on May 6, 2012—the statement in his letter to Zank, and the statement in his inmate complaint—the plaintiff himself submitted only the May 6, 2012 inmate complaint at the hearing before O'Donovan. Dkt. No. 36 at 15. The defendants assert that O'Donovan rejected the plaintiff's argument that he'd never made the sexual assault allegation outside the complaint process because "it really does not make sense that Zank, who is a PREA Investigator, not a complaint examiner, would only know about [the plaintiff's] allegation from an inmate complaint." Id. They also argue that O'Donovan pointed out that in his own "materials," the plaintiff had

recounted reporting his sexual assault allegations "to a lieutenant outside the complaint process . . . ." Id. at 15, n.4.

Finally, they argue that even if the plaintiff could somehow make a *prima facie* case of retaliation against O'Donovan, no reasonable jury could conclude that O'Donovan's stated basis for sanctioning the plaintiff—that the plaintiff lied about a staff member to someone outside the complaint process—was a lie. Id. at 16. They argue that the video did not show any sexual assault (although the defendants admit it was inconclusive); that Officer Lunde contradicted the plaintiff's claim that he'd objected to the accused officer's pat down search; and that the accused officer himself denied the plaintiff's allegations. Id. at 17. This means, the defendants argue, that O'Donovan would have disciplined the plaintiff regardless of whether he had exercised his First Amendment rights, because the evidence before O'Donovan clearly showed that the plaintiff had violated §DOC 303.271. Id.

The plaintiff responded that the defendants have not showed that the accused officer did not touch him inappropriately. Dkt. No. 45 at 8. He says that the defendants have admitted that they were not in a position to determine whether what the plaintiff said about the accused officer was true. Id. at 11-12.

O'Donovan concluded that Zank had no vested interest in the outcome of the hearing; the defendant has not disputed that conclusion. O'Donovan found that the plaintiff contradicted himself—at the hearing, he denied saying that the accused officer karate chopped him, while in the complaint, the plaintiff

described the assault as the accused officer karate chopping him in his testicles in an upward motion. The plaintiff disagrees that he contradicted himself. Dkt. No. 54 at 7. He does not dispute that he said in his complaint that the accused officer karate chopped his testicles, id.; he can't, because the complaint is in evidence, and it says, "when the officer started from the ankle and continued up one of my legs he stiffened his hand in what I can describe as a karate chop, and *karate chopped my testicles in an upward motion*." Dkt. No. 38-5 at 11. Rather, he says that he was just using the expression "karate chopped" to describe the motion of the accused officer's hand. Dkt. No. 54 at 7. He argues that he should have described the officer as using a "bladed" hand, but that he didn't know that term at the time he wrote his complaint. Id. He says that he explained this semantic issue to O'Donovan in his written statement for the hearing, and that he explained it at the hearing. Id. The record contains that written statement. Dkt. No. 58-5 at 10.

O'Donovan found that the plaintiff had made the sexual assault allegations to someone outside the complaint process—Lt. Braemer. This finding has some support in the complaint itself—the plaintiff indicated that he'd tried to contact Braemer to report the assault, but had received no response. Dkt. No. 38-5 at 11. The plaintiff also listed Braemer and "Gregory Storks" in the section of the complaint that asked for the names of people who had information about the complaint. Id. Finally, O'Donovan noted that the accused officer and Lunde had contradicted the plaintiff's version of events.

The court has found that the plaintiff has raised no genuine issue of material fact as to Zank's motivation for issuing the conduct report; neither has he raised any such issue regarding O'Donovan's motivation. The plaintiff essentially disagrees with O'Donovan's conclusion that he lied about staff outside the complaint review process. That is the plaintiff's prerogative, but his disagreement does not constitute proof that O'Donovan had a retaliatory motive.

### 3. *Pollard and the Affirmation of the Sanction*

Neither party addresses defendant Pollard in summary judgment pleadings. In his amended complaint, the plaintiff alleged that he appealed O'Donovan's decision to Pollard. Dkt. No. 11 at 2. He says that in his appeal, he pointed out to Pollard that there "was no evidence in the record to support the charges or the finding of guilt." Id. He further alleges that Pollard "affirmed the finding of guilt only stating, 'Penalty and finding of guilt appropriate.'" Id. In its screening order, the court allowed the plaintiff to proceed against Pollard because the plaintiff alleged that "Pollard summarily affirmed [O'Donovan's] finding." Dkt. No. 17 at 5. Now that summary judgment briefing is complete, it appears that the only involvement Pollard had in the process was to affirm O'Donovan's conclusion.

The plaintiff has raised no genuine issue of material fact as to Pollard's motivation for affirming O'Donovan's conclusion. His allegation that Pollard did

not investigate himself does not constitute evidence that Pollard was motivated by retaliatory animus.

D  Conclusion

The plaintiff has not raised a genuine issue of material fact as to retaliatory animus for any of the three defendants. Summary judgment is appropriate.

**IV. Plaintiff's Motion to Strike Exhibit 1002-18 through 24 (Dkt. No. 43)**

The plaintiff has asked the court to strike pages 18 through 24 of docket number 38-3, Zank's PREA report. Dkt. No. 43. The pages that the plaintiff asks the court to strike appear to be a sort of transcript of Zank's interview of the plaintiff. In his motion to strike, the plaintiff argues that he didn't sign the transcript or admit that he made the comments in it, and argues that the defendants cannot produce any evidence that he made those statements.

The plaintiff's arguments go to the weight of the evidence, not to whether it should be part of the record. He is free to argue—and he has—that the court should not consider the "transcript," because it is unreliable. The plaintiff's assertion that the evidence the defendants submitted is not reliable is not a reason to strike it. Perhaps more relevant, the court did not rely on the pages the plaintiff references; the court did not even read them. The court's decision is based on the evidence it has cited above.

## IV.  Defendants' Motion for Leave to File Declarations in Support of Defendants' Motion for Summary Judgment (Dkt. No. 49)

Finally, the defendants have moved for leave to file additional declarations which they assert they inadvertently left out of their initial filing. Dkt. No. 49. The plaintiff responded that he did not oppose the motion. Dkt. No. 56. The court will grant the motion.

## VI.  Conclusion

The court **DENIES** the plaintiff's motion pursuant to Rule 54(b). Dkt. No. 29.

The court **DENIES** the plaintiff's motion to compel discovery. Dkt. No. 32.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 35.

The court **DENIES** the plaintiff's motion to strike Exhibit 1002-18 through 24. Dkt. No. 43.

The court **GRANTS** the defendants' motion for leave to file declarations in support of defendants' motion for summary judgment. Dkt. No. 49.

The court **ORDERS** that this case is **DISMISSED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 27th day of August, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**